Filed in Douglas District Court
*** EFILED ***
Case Number: D01CI170007821
Transaction ID: 0005768502
Filing Date: 09/13/2017 12:51:45 PM CDT

## IN THE DISTRICT COURT OF DOUGLAS COUNTY, NEBRASKA

APPLIED UNDERWRITERS, INC., a Nebraska Corporation, )

Plaintiff. )

vs. )

SEDGWICK CLAIMS MANAGEMENT SERVICES, INC., a Delaware Corporation, )

Defendant. )

CASE NO. _____

**COMPLAINT FOR INJUNCTIVE RELIEF AND MONETARY DAMAGES FOR:**
(1) Breach of Fiduciary Duty
(2) Tortious Interference with Contract
(3) Unjust Enrichment
(4) Conspiracy to Violate The Nebraska Trade Secrets Act, Neb. Rev. Stat. §87-501 et. seq.
(5) Violation of the Nebraska Trade Secrets Act, Neb. Rev. Stat. §87-501 et. seq.
(6) Unfair Trade Practices
(7) Conversion

COMES NOW Applied Underwriters, Inc., the Plaintiff herein and for its complaint against the Defendant states and alleges as follows:

### THE PARTIES

1.  Applied Underwriters, Inc. ("Applied") is a Nebraska corporation with its principal place of business in Omaha, Douglas County, Nebraska.

2.  Defendant Sedgwick Claim Management Services, Inc. ("Sedgwick") is a Delaware corporation with its principal place of business in Memphis, Tennessee, qualified to do business as a foreign corporation in Omaha, Douglas County, Nebraska.

3.  Sedgwick acts as a Third Party Administrator ("TPA") for workers' compensation claims with an office located at 10909 Mill Valley Road, Omaha, Douglas

1



EXHIBIT A

County, Nebraska within one (1) mile of Applied's offices.

## FACTUAL BACKGROUND

4.      Applied is a diversified financial services corporation that owns six property and casualty insurance companies.

5.      Of those six property and casualty insurance companies, California Insurance Company ("CIC") and Continental Indemnity Company ("CNI") write workers' compensation insurance throughout the United States.

6.      Applied has engaged Sedgwick to adjust certain workers' compensation claims on its behalf as well as for the internal Applied employers pursuant to a Services Agreement For Administration Of A Claims Program (the "Sedgwick Contract"), a copy of which is attached hereto as Exhibit 1.

7.      Paragraph 8(C) of the Sedgwick Agreement provides in part:

> Each party agrees to protect Confidential Information received hereunder with the same degree of care that such party exercises with its own confidential information (but in no event less than reasonable care) and to limit access and disclosure of Confidential Information only to their employees, agents and contractors who have a "need to know," and who agree to maintain confidentiality in accordance with this section. Notwithstanding the foregoing, Client agrees to permit Sedgwick to compile and disseminate aggregate, de-identified information for benchmarking purposes or forward to a data collection facility for Qualified Claims handled pursuant to this Agreement, provided that such facility agrees in writing to keep Client's data confidential. Further, Sedgwick shall be entitled, without violation of this section and without the prior consent of Client, to retain claims administration information and to forward claims administration information to government agencies to the extent required by law for the proper performance of the services set forth herein.

8.      The Sedgwick Agreement has been renewed (the "Sedgwick Renewal").

2

9.      Throughout the years, Applied at significant cost and expense has developed an extensive proprietary training program for claims adjusters that adjust workers' compensation claims. This training program teaches individuals special skills and knowledge. Applied continues to make a significant investment in the development and improvement of its workers' compensation claim adjusters. CIC and CNI's claims department is headquartered in Omaha, Nebraska, and all of the adjusters are employees of Applied.

10.     In addition to developing an extensive proprietary training program for its claims adjusters, Applied has also developed certain forms, procedures, methodologies, and special procedures, including a list of qualified medical experts, nurse care managers, and attorneys, all of which is proprietary.

11.     Applied has taken the necessary and appropriate steps to protect the proprietary nature of its adjuster training program as well as its forms, procedures, methodology and other information by requiring employees to execute Proprietary Information Agreements. The foregoing represented special knowledge and skill not readily ascertainable by anyone outside Applied. These proprietary matters afford Applied a competitive advantage over other similarly situated insurance companies.

12.     During the term of the Sedgwick Agreement and Sedgwick Renewal, Sedgwick has engaged and continues to engage in an ongoing premeditated raid of Applied's claim adjusters.

13.     Applied made written demand that Sedgwick cease and desist from soliciting Applied's employees and interfering with Applied's contractual relationship with its employees (the "Cease and Desist Letter"). A copy of the Cease and Desist Letter is

3

attached as Exhibit 2.

14.      Sedgwick has failed, refused and neglected to cease and desist from soliciting Applied's employees and interfering with Applied's contractual relationship with its employees. See Exhibit 3 attached hereto.

15.      The following Applied employees have been solicited and hired by Sedgwick (the "Sedgwick/Applied Employees"):

> Kelli Pofahl
> Nicole Whitehead
> Shannon Casey
> Zachary Taylor
> Rebecca English
> Travis Orr
> Crystal Swoboda

16.      Each of the Sedgwick/Applied Employees executed a Proprietary Information Agreement, copies of which are attached as Exhibit 4.

17.      None of the Sedgwick/Applied Employees had any experience as a claims adjuster when first hired by Applied. Prior to adjusting any workers' compensation claims for Applied, the Sedgwick/Applied Employees received comprehensive training from Applied in which each was taught to adjust workers' compensation claims in addition to significant ongoing training to allow each of them to adjust more complicated workers' compensation claims.

18.      During the course of their employment with Applied, each of the Sedgwick/Applied Employees had access to Applied's proprietary claims information, forms, procedures, methodology and expert listings, and recognized such information as proprietary.

19.      Applied is informed and believes and thereon alleges that Sedgwick has not

4

incurred significant cost and expense to develop a comprehensive training program for their claims adjusters nor independently developed proprietary forms, procedures, methodology, and expert lists.

20.    As a result, in order to obtain qualified claims adjusters for its workers' compensation business, Sedgwick has directed its recruiting department to unjustifiably target and induce Applied's experienced workers' compensation claims adjusters to terminate their employment with Applied and become workers' compensation claims adjusters for Sedgwick.

21.    Sedgwick's efforts to induce Applied's experienced workers' compensation claims adjusters to terminate their employment with Applied is an effort to unjustly enrich Sedgwick at the expense of Applied and allow Sedgwick to develop an experienced workers' compensation claim adjusting unit without incurring the significant expense otherwise necessary.

22.    Applied is informed and believes and thereon alleges that in addition to improperly interfering with Applied's claims adjusters, the Sedgwick/Applied Employees while still employed at Applied, and at the specific instance and request of Sedgwick were requested to obtain, transmit, communicate and deliver to Sedgwick Applied's proprietary information concerning workers' compensation forms, procedures, methodologies, information, expert lists and training.

23.    Applied is informed and believes, and thereon alleges that Sedgwick is currently using Applied's proprietary information improperly obtained by the Sedgwick/Applied Employees in the current claims operation of Sedgwick.

24.    Sedgwick agreed in May 12, 2017 correspondence not to unilaterally contact

5

Applied's employees (the "Sedgwick Assurance"), a copy of which is attached as Exhibit 5.

25.     Notwithstanding the Sedgwick Assurance, Sedgwick has continued to unilaterally contact Applied's employees to leave their employment with Applied and become employed by Sedgwick.

## FIRST CAUSE OF ACTION

## BREACH OF FIDUCIARY OBLIGATION

26.     Applied incorporates herein Paragraphs 1 through 25 as if fully set forth herein.

27.     As a result of the Sedgwick Contract and Sedgwick Renewal, Sedgwick owed Applied a fiduciary duty which required it to refrain from conducting activities in any manner inimical to Applied's best interests.

28.     Sedgwick breached its fiduciary duty to Applied by engaging in the wrongful conduct alleged herein, including, but not limited to soliciting and hiring Applied's well-trained claims adjusters.

29.     Applied has suffered and will continue to suffer immediate and irreparable harm, and will continue to suffer such injury until the breach is preliminarily and permanently enjoined.

## SECOND CAUSE OF ACTION

## TORTIOUS INTERFERENCE WITH CONTRACT

30.     Applied incorporates herein Paragraphs 1 through 29 as if fully set forth herein.

6

31.   Sedgwick has tortiously interfered with Applied's contractual agreements with its claims adjusters.

## THIRD CAUSE OF ACTION

### UNJUST ENRICHMENT

32.   Applied incorporates herein Paragraphs 1 through 31 as if fully set forth herein.

33.   As a result of obtaining the benefit of Applied's experienced workers' compensation claims adjusters without the necessity of expending significant monies and time, Sedgwick has been unjustly enriched.

## FOURTH CAUSE OF ACTION

### CONSPIRACY TO VIOLATE NEBRASKA TRADE SECRETS ACT
### NEB. REV. STAT. §87-501 ET. SEQ.

34.   Applied incorporates herein Paragraphs 1 through 31 as if fully set forth herein.

35.   Sedgwick conspired with the Applied/Sedgwick Employees to misappropriate Applied's trade secrets in violation of the Nebraska Trade Secrets Act, Neb. Rev. Stat. §87-501 et. seq. with  respect to the training of claims adjusters to adjust workers' compensation claims in addition to the forms, procedures, methodology and information utilized by Applied.

## FIFTH CAUSE OF ACTION

### VIOLATION OF THE NEBRASKA TRADE SECRETS ACT
### NEB. REV. STAT. §87-501 ET. SEQ.

36.   Applied incorporates herein Paragraphs 1 through 35 as if fully set forth

7

herein.

37.     Sedgwick misappropriated Applied's trade secrets in violation of the Nebraska Trade Secrets Act, Neb. Rev. Stat. §87-501 et. seq. with respect to the training of claims adjusters to adjust workers' compensation claims in addition to the forms, procedures, methodology, expert lists and information utilized by Applied.

## SIXTH CAUSE OF ACTION

## UNFAIR TRADE PRACTICES

38.     Applied incorporates herein Paragraphs 1 through 37 as if fully set forth herein.

39.     Sedgwick's actions in misappropriating Applied's trade secrets without the corresponding expenditure of time and money is an unfair trade practice providing Sedgwick with an unfair competitive advantage in marketing, providing, and adjusting workers' compensation insurance.

## SEVENTH CAUSE OF ACTION

## CONVERSION

40.     Applied incorporates herein Paragraphs 1 through 39 as if fully set forth herein.

41.     Sedgwick wrongfully and inappropriately converted Applied's trade secrets to its use without Applied's consent or permission.

## EIGHTH CAUSE OF ACTION

## BREACH OF COVENANT OF GOOD
## FAITH AND FAIR DEALING

42.     Applied incorporates Paragraphs 1 through 41 of its Complaint as if fully set

8

forth herein.

43.     By the above described conduct, Sedgwick has breached the covenant of good faith and fair dealing in the Sedgwick Contract and Sedgwick Renewal. By its conduct, Sedgwick has damaged Applied of the benefit it reasonably expected to obtain at the time the Sedgwick Contract and Sedgwick Renewal were executed.

WHEREFORE, Applied prays for judgment as follows:

## ON THE FIRST CAUSE OF ACTION FOR
## BREACH OF FIDUCIARY OBLIGATION

1.     Preliminary and permanent injunction in the form of an injunction to enjoin, restrain, and prevent Sedgwick from tortiously interfering with Applied's contractual arrangements with its employees, and requiring the establishment of appropriate and effective means to prevent further violation.

2.     For compensatory damages according to proof at trial proximately caused by Sedgwick's tortious interference with Applied's contractual arrangement with its employees.

## ON THE SECOND CAUSE OF ACTION FOR
## TORTIOUS INTERFERENCE WITH CONTRACT

1.     Preliminary and permanent injunction in the form of an injunction to enjoin, restrain, and prevent Sedgwick from tortiously interfering with Applied's contractual arrangements with its employees, and requiring the establishment of appropriate and effective means to prevent further violation.

2.     For compensatory damages according to proof at trial proximately caused by Sedgwick's tortious interference with Applied's contractual arrangement with its

9

employees.

## ON THE THIRD CAUSE OF ACTION
## FOR UNJUST ENRICHMENT

1.      For compensatory damages according to proof at trial and disgorgement of

profits proximately caused by Sedgwick's unjust enrichment.

## ON THE FOURTH CAUSE OF ACTION FOR
## CONSPIRACY TO VIOLATE THE TRADE SECRETS ACT

1.      Preliminary and permanent injunction in the form of an injunction to enjoin,

restrain and prevent Sedgwick from misappropriating Applied's trade secrets in violation

of the Nebraska Trade Secrets Act, Neb. Rev. Stat. §87-501 et. seq.

2.      For compensatory damages according to proof at trial proximately caused

by Sedgwick's misappropriation of trade secrets.

3.      For disgorgement of profits realized as a direct and proximate result of

Sedgwick's misappropriation of Applied's trade secrets in violation of the Nebraska Trade

Secrets Act, Neb. Rev. Stat. §87-501 et. seq.

## ON THE FIFTH CAUSE OF ACTION

## VIOLATION OF THE NEBRASKA TRADE SECRETS ACT
## NEB. REV. STAT. §87-501 ET SEQ.

1.      Preliminary and permanent injunction in the form of an injunction to enjoin,

restrain and prevent Sedgwick from misappropriating Applied's trade secrets in violation

of the Nebraska Trade Secrets Act, Neb. Rev. Stat. §87-501 et. seq. and the Proprietary

Information Agreements executed.

2.      For compensatory damages according to proof at trial proximately caused

by Sedgwick's misappropriation of trade secrets.

10

## ON THE SIXTH CAUSE OF ACTION
## UNFAIR TRADE PRACTICE

1.      Preliminary and permanent injunction in the form of an injunction to enjoin,

restrain and prevent Sedgwick from misappropriating Applied's trade secrets in violation

of the Nebraska Trade Secrets Act, Neb. Rev. Stat. §87-501 et. seq.

2.      For compensatory damages according to proof at trial proximately caused

by Sedgwick's misappropriation of trade secrets.

## ON THE SEVENTH CAUSE OF ACTION
## CONVERSION

1.      Preliminary and permanent injunction in the form of an injunction to enjoin,

restrain and prevent Sedgwick from misappropriating Applied's trade secrets in violation

of the Nebraska Trade Secrets Act, Neb. Rev. Stat. §87-501 et. seq.

2.      For compensatory damages according to proof at trial proximately caused

by Sedgwick's misappropriation of trade secrets.

## ON THE EIGHTH CAUSE OF ACTION
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

1      For compensatory damages according to proof at trial.

APPLIED UNDERWRITERS, INC., Plaintiff


BY ___ /s/Jeffrey A. Silver _____
  JEFFREY A. SILVER    #13839
  10805 Old Mill Road
  Omaha, Nebraska  68154
  (402) 393-1984
  ATTORNEY FOR PLAINTIFF


11

## SERVICE AGREEMENT FOR ADMINISTRATION OF A CLAIMS PROGRAM

This Agreement is entered into effective the 1st day of May, 2016, by and between Sedgwick Claims Management Services, Inc. ("Sedgwick") and Applied Underwriters, Inc. ("Client").

### RECITALS

1.  Client insures its claims administration program for workers compensation risks and desires to have Sedgwick provide the specific services set forth below in connection with such insured program (the "Program," as defined on Exhibit A, attached hereto), and Client's carrier(s) ("Insurer") has agreed that these claims services will be provided by Sedgwick, subject to the terms of a separate written agreement between Sedgwick and Insurer.

2.  Sedgwick is willing to provide such services on the terms and conditions hereinafter stated.

### AGREEMENT

1.  <u>Services to Be Performed by Sedgwick:</u>  Sedgwick agrees to perform the following services:

    A.  With regard to Claims Administration, Sedgwick shall:

        (1)  During the term of this Agreement, review all claim and loss reports received from Client that are required to be reviewed under the Program (a "Qualified Claim"), and process each such claim or loss report in accordance with applicable statutory and administrative regulations;

        (2)  Conduct an investigation of each Qualified Claim to the extent deemed necessary by Sedgwick in the performance of its obligations hereunder;

        (3)  Arrange for independent investigators, appraisers, or medical or other experts to the extent deemed necessary by Sedgwick in connection with processing any Qualified Claim;

        (4)  Pay benefits, expenses, and adjust or settle each Qualified Claim, but only if in the sole judgment of Sedgwick such payment would be prudent for Client and the anticipated amount thereof does not exceed the limit specified in accordance with paragraphs 2F and 2G below, or as Client specifically approves or directs such action in writing;

        (5)  Maintain a file for each Qualified Claim which shall be the property of

**EXHIBIT**

tabbies

1

Client (for self-insured claims) or Insurer (for insured claims) and which shall be available for review by Client or Insurer during normal business hours upon three (3) days prior written notice;

(6)   Assist Client's counsel, if requested, in preparing the defense of litigated cases arising out of Qualified Claims, negotiating settlements and pursuing subrogation or contribution actions;

(7)   Maintain a current estimate of the expected total cost of each Qualified Claim which is based on facts known at the estimation date, but is not trended or actuarially developed;

(8)   Use a proprietary data management system to furnish to Client agreed upon loss and information reports. These reports shall contain information such as each Qualified Claim date, condensed claim description, payments made, estimated future costs and total expected costs of all Qualified Claims, as well as summary and other data deemed relevant by Sedgwick, but not IBNR (incurred but not reported) claims or actuarially developed loss values; and

(9)   Annually report federal, state and local 1099 information under Client's tax identification number(s), when Client has provided all required IRS authorizations, for vendor payments issued by Sedgwick on bank accounts owned by Client, but not for payment authorizations when Sedgwick does not issue the checks.

B.   Sedgwick will provide managed care services as set forth in the attached Managed Care Service Schedule.

C.   Sedgwick will provide the call center services as set forth in the attached Call Center Service Schedule.

D.   Sedgwick shall provide the special investigative unit (SIU) services set forth in the attached SIU Service Schedule.

E.   Sedgwick shall provide Client with the capability to perform searches in a database which contains information regarding Client's Qualified Claims as set forth in the attached OSHA Database Service Schedule.

F.   Sedgwick will provide the MMSEA/SCHIP Reporting services as set forth in the Medicare Reporting Services Schedule attached hereto.

G.   Sedgwick will provide additional Medicare compliance services as set forth in Medicare Compliance Schedule attached hereto.

2

H.  Sedgwick will provide the clinical consultation services as set forth in the Clinical Consultation Services Schedule attached hereto.

2.  **Obligations of Client:**

A.  Client shall pay to Sedgwick a service fee which, in the initial term of this Agreement, shall be computed and payable as shown in Exhibit B, attached hereto and made a part of this Agreement, plus applicable taxes, if any.

C.  Client shall at all times provide funds adequate for the payment of Qualified Claims, including allocated loss adjustment expenses.  For purposes of this Agreement, allocated loss adjustment expenses shall mean all costs, charges or expenses incurred by Sedgwick, its agents or its employees which are properly chargeable to a Qualified Claim including, without limitation, court costs; fees and expenses of attorneys; appeal bonds; independent adjusters; investigators; appraisers; vocational services, training or evaluation; medical expenses and medical cost containment service providers (including those provided by Sedgwick, if applicable); durable medical equipment; rehabilitation services; experts and witnesses; fees for obtaining statements, diagrams, reports, records, documents, transcripts, depositions, index bureau filings and re-filings, and photographs; cost of file retrieval; cost associated with the pursuit of subrogation and/or Special Injury Fund claims; hearing representation services; and travel fees and expenses incurred at Client's request.

D.  Client shall deposit funds for payment of Qualified Claims, including allocated loss adjustment expenses, in a bank account or accounts (the "Claim Account").  Client shall be responsible for providing sufficient funds to enable Sedgwick to write checks on the Claim Account for use in the payment of Client's Qualified Claims.  Such funds shall be provided by electronic funds transfer at the inception of the Program and replenished by electronic funds transfer promptly from time to time thereafter.  The amount of the escrow required for the Claim Account may be modified in the following instances:

(1)  There is a substantial increase or decrease in claims payment activity;

(2)  Client fails to fund the Claim Account within the agreed upon time period;

(3)  There is a change in funding cycle;

(4)  The escrow is recalculated at Client's request; or

(5)  The escrow amount is automatically recalculated on an annual basis.

E.  It is expressly understood that Sedgwick shall not be required to advance its own funds to pay losses or allocated loss adjustment expenses for any Qualified Claim hereunder.  It is further understood that if Client fails to promptly provide funds

sufficient to allow required payments to be made timely, or if funds previously provided by or on behalf of Client are seized, frozen or otherwise unavailable to Sedgwick to allow required payments to be made timely on account of the bankruptcy, receivership, or other insolvency proceeding of Client [or Insurer, in cases where Insurer funds claim account], Sedgwick will have no obligation to perform any claims payments services during any period of underfunding.

F.  Sedgwick shall have full discretion to make an individual payment of an allocated loss adjustment expense in an amount up to $5,000 on any Qualified Claim and shall not need the approval of Client to make such payments.  This amount may be changed at any time by Client upon ten (10) days prior written notice to Sedgwick.  It is agreed that Sedgwick shall have full authority and control in all matters pertaining to the payment, processing, investigation and administration of Qualified Claims within the limit established by this paragraph.

G.  Sedgwick shall have full discretion to redeem compromise or settle any Qualified Claim for an amount not to exceed  $20,000 and shall not need the approval of Client to consummate such redemption, compromise or settlement.  This amount may be changed at any time by Client upon ten (10) days prior written notice to Sedgwick.  Failure of Sedgwick to settle a Qualified Claim within such limit, however, shall not subject Sedgwick to any liability whatsoever in the event of an adverse judgment entered by any court or the settlement of such Qualified Claim for an amount in excess of such limit.

H.  Should Client fail to make timely payments of any service fees due Sedgwick or should Client in any other way breach a material term of this Agreement, Sedgwick shall then have the right to refuse to perform any further services.  If Sedgwick elects to exercise its rights under this paragraph, in addition to all other legal or equitable remedies, Sedgwick will have the right to its full minimum fee, if any, as well as any other fees for which Sedgwick may be eligible, and may collect such fees from any loss fund that may be in Sedgwick's care, custody and control.

3.  **Discontinuance of Operations:**

Should Client discontinue its business for any reason, all fees due Sedgwick shall be paid immediately.  Sedgwick shall have no further obligation to continue to provide the services called for in this Agreement, and, at Sedgwick' option, this Agreement shall be considered terminated as of the date Client ceases operations or is subject to a bankruptcy or receivership filing, either voluntarily or involuntarily.

4.  **Covered Jurisdictions:**

This Agreement shall cover all operations of Client in states in which the Client has employees. This agreement shall also cover the states of AK, HI, NM and NV for policyholders of Client affiliates.

4

5.    **Term of Agreement and Termination:**

    A.    The term of this Agreement shall be for the period commencing on April 1, 2016 and ending on March 31, 2017.

    B.    This Agreement may be terminated by either party at any time, provided that at least sixty (60) days prior written notice of the effective date of termination is given to the other party.

    C.    Sedgwick is providing services to Client on a life of contract basis. If requested by Client, Sedgwick will continue to process Client's Qualified Claims remaining open at the expiration or termination of this Agreement, if any, provided that Client shall continue to make adequate funds available for the payment of such Qualified Claims, including any allocated loss adjustment expenses and pay information technology and data tape fees. This provision shall not apply unless the additional fee for this service shall have been negotiated and agreed to in writing prior to the effective date of termination.

    D.    If Sedgwick is required by Insurer to adjust Client's insured Qualified Claims after expiration or termination of this Agreement, Client shall continue to fund claims payments and allocated loss adjustment expenses as otherwise provided herein, and Client shall pay Sedgwick a mutually agreed upon fee, plus the prevailing fee for any information technology or data tapes required by Insurer.

    E.    If Insurer fails to pay Sedgwick service fees which it is obligated to pay, then Sedgwick may present all unpaid invoices to Client and Client shall pay such service fees within thirty (30) days of presentment. If Insurer is responsible for funding the Claim Account and fails to adequately do so, then Client shall immediately and adequately fund the Claim Account upon notice from Sedgwick of the deficiency.

    F.    Upon expiration or termination of this Agreement, Sedgwick shall deliver, at Client's sole cost, the hard copy and imaged files that Sedgwick has maintained for Qualified Claims (but not including any computer hardware, firmware, software or other proprietary information of Sedgwick), except those Sedgwick has agreed in writing to continue to process or files that are owned by Insurer; provided, however, that Sedgwick or its agents, employees or attorneys shall continue to be entitled to inspect all such files and make copies or extracts there from. Imaged files shall be transferred to Client in the same electronic format. If Client does not agree to accept such files, they will be retained or destroyed at Sedgwick's option and Client shall have no recourse against Sedgwick for failure to retain them. Upon request and for the prevailing fees at the time of termination, Sedgwick will also provide its standard tape(s) containing the computer data for the Qualified Claim files stored on Sedgwick's computer system(s).

6.    **Practice of Law:**

It is understood and agreed that Sedgwick will not perform, and Client will not request performance of, any services which may constitute the unauthorized practice of law.

7.    **Indemnification:**

A.    Sedgwick shall be fully responsible for exercising reasonable care at all times in the performance of its obligations hereunder. However, if Sedgwick is named as a party to any litigation or proceeding, or is the subject of any claim or demand because of its actions on behalf of Client, Client agrees to indemnify, defend, and hold Sedgwick, its officers, directors, employees and agents harmless from any and all losses, damages, costs, judgments and expenses (including attorney's fees and costs) with respect to any such litigation, proceeding, claim or demand, unless and until a finding is entered to the effect that Sedgwick failed to exercise such reasonable care in the performance of its obligations hereunder. Sedgwick agrees to indemnify, hold harmless and defend Client, its directors, officers, employees and agents from and against any and all liabilities, loss or damage that they may suffer as a result of any claim, demand, cost or judgment against them arising out of the negligence or willful misconduct of Sedgwick in connection with its performance under this Agreement, provided that such acts or omissions do not arise out of or relate to oral or written instructions, procedures or forms supplied by Client or to Client's internal management or adjustment of its claims. Each party agrees to keep the other fully informed of any matter for which it is defending, holding harmless or indemnifying the other party. Each party reserves the right to appoint its own counsel, at its own expense, regarding any matter defended hereunder and to approve any settlements of same.

B.    Notwithstanding anything to the contrary contained in the above paragraph, it is understood and agreed that if Client, directly or through a subcontractor or vendor of Client's choosing ("Client Subcontractor"), retains administration of a claim or performs any services for a claim Sedgwick administers, or if Client otherwise directs the administration of a claim, Client will indemnify, defend, and hold Sedgwick, its officers, directors, employees and agents harmless from the losses, damages, costs, judgments and expenses (including attorney's fees and costs) as a result of any litigation or proceeding, fines, penalties, revocation of license, or any other state regulatory investigation or action arising against Sedgwick related to the acts or omissions of Client or the Client Subcontractor.

C.    If Client's access to claim data includes the ability to add and modify data, Sedgwick shall not be required to verify, or otherwise be responsible for, the accuracy of data added or modified by Client. Client shall indemnify, defend and hold Sedgwick, its officers, directors, employees and agents harmless for any loss, cost (including attorney's fees), claim or judgment which is attributable to Client's input or modification of data.

6

D.     The provisions of this section shall survive the expiration or termination of the Agreement.

8.   **Network Security/Confidentiality:**

A.     If Client's access to the data management system requires a network connection (the "Network Connection") between Client's network and Sedgwick's network, Sedgwick and Client shall take reasonable and customary precautions to prevent unauthorized access to or use of the Network Connection through their respective networks. The parties agree, however, that each party is responsible for the security of its own network. Neither party shall be liable to the other for unauthorized access to the Network Connection, so long as the accused party shall have taken reasonable and customary precautions to prevent such unauthorized access.

B.     Whether or not marked as such, and without regard to the media in which such records are stored, "Confidential Information" shall mean:

(1)     any business or technical information pertaining to the parties herein or to third parties, which is furnished, disclosed or made available by one party to the other, including, without limitation, specifications, prototypes, software, marketing plans, financial data and personnel statistics; and

(2)     Medical records, reports and information, as well as any other non-medical records, reports or information pertaining to claimants under the Program.

C.     Each party agrees to protect Confidential Information received hereunder with the same degree of care that such party exercises with its own confidential information (but in no event less than reasonable care) and to limit access and disclosure of Confidential Information only to their employees, agents and contractors who have a "need to know," and who agree to maintain confidentiality in accordance with this section. Notwithstanding the foregoing, Client agrees to permit Sedgwick to compile and disseminate aggregate, de-identified information for benchmarking purposes or forward to a data collection facility data for Qualified Claims handled pursuant to this Agreement, provided that such facility agrees in writing to keep Client's data confidential. Further, Sedgwick shall be entitled, without violation of this section and without the prior consent of Client, to retain claims administration information and to forward claims administration information to government agencies to the extent required by law for the proper performance of the services set forth herein.

D.     The provisions of this section shall survive the expiration or termination of the Agreement.

9.   **Notices:**

7

Any notice required to be given under this Agreement shall be sent by certified or registered mail, postage prepaid, to General Counsel, Sedgwick Claims Management Services, Inc., 1100 Ridgeway Loop Road, Memphis, TN 38120, in the case of Sedgwick, and to Peter Gunn, Director of Claims, Applied Underwriters Inc., 10805 Old Mill Road, Omaha, NE 68154 in the case of Client.

10. **Successors:**

This Agreement shall be binding upon and shall inure to the benefit of all transferees, assigns and successors in interest of any kind of the parties hereto, but no transfer or assignment may be made without the prior written permission of the other party.

11. **Entire Agreement and Modification or Amendment:**

This Agreement and its attached exhibits and schedules represents the full and final understanding of the parties with respect to the subject matter described herein and supersedes any and all prior agreements or understandings, written or oral, express or implied. This Agreement may be modified or amended only by a written statement signed by both parties.

12. **Applicable Law:**

The terms and conditions of this Agreement shall be governed by the laws of the State of Tennessee without regard to conflicts of law principles.

13. **Force Majeure:**

Neither party shall be liable to the other party or be deemed to have breached this Agreement for any failure or delay in the performance of all or any portion of its obligations under this Agreement if such failure or delay is due to any contingency beyond its reasonable control (a "force majeure"). Without limiting the generality of the foregoing, such contingency includes, but is not limited to, acts of God, fires, floods, pandemics, storms, earthquakes, riots, boycotts, strikes, lock-outs, acts of terror, wars and war operations, restraints of government, power or communication line failure or other circumstance beyond such party's reasonable control, or by reason of the bankruptcy, receivership or other insolvency proceeding of any bank or other financial institution where funds to pay losses and allocated loss adjustment expenses are held, or by reason of a judgment, ruling or order of any court or agency of competent jurisdiction or change of law or regulation subsequent to the execution of this Agreement. Both parties are obligated to provide reasonable back-up capability to avoid the potential interruptions described above. If a force majeure occurs, the party delayed or unable to perform shall give immediate notice to the other party. Client acknowledges that the foregoing provision does not apply to Client's obligation to make timely payment of any fees due Sedgwick, and that Sedgwick shall be entitled to all remedies set forth in this Agreement and those allowed by law for Client's failure to timely pay such fees.

14. **Headings:**

Headings herein are for convenience of reference only and shall not be considered in any interpretation of this Agreement.

15. **Relationship of Parties; Expenses:**

Nothing contained in this Agreement shall be deemed to create a partnership or joint venture between the parties hereto; the only relationship among the parties shall be that of independent parties to a contract. Except as expressly provided herein, no party hereto shall have authority or shall hold itself out as having authority to act for or bind any other party hereto. Except as expressly set forth herein, each party shall bear all expenses it may incur in connection with the execution, delivery and performance of this Agreement.

16. **Waiver of Breach:**

Failure of either party hereto to require the performance by the other party hereto of any obligation under this Agreement shall not affect its right subsequently to require performance of that or any other obligation. Any waiver by any party hereto of any breach of any provision of this Agreement shall not be construed as a continuing waiver of any such provision or a waiver of any succeeding breach or modification of any other right under this Agreement.

17. **Subcontractor Disclosure:**

Through contractual arrangements with subcontractors, Sedgwick provides a full range of medical management and investigative services to its clients, as well as structured settlements, claim indexing services, imaging, auto-bill adjudication, and extra-territorial claims administration services. Medical management services include, but are not limited to, bill review, network access, pharmacy benefits management, peer review, field case management, electro-medical devices, bone growth stimulators, orthotics, prosthetics, translation and interpretation, transportation, medical supplies, IV and respiratory therapy, home health, and durable medical equipment. Client recognizes and agrees that delivery of some of these services is being provided pursuant to separate agreements between subcontractors and Sedgwick. Invoices for these services will be paid as allocated loss adjustment expenses on individual claims, unless otherwise agreed between Client and Sedgwick. Notwithstanding the foregoing, Client agrees and understands that Client is obligated to make payment to the subcontractors either directly or by remitting such payment to Sedgwick, for any money due for subcontracted services which have been provided under this Agreement. Client acknowledges that Sedgwick receives a portion of charges for subcontracted services as reimbursement for cost of program management, administration, and technological and service enhancements. In no event will charges to Client exceed the amount indicated in the Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on the

day and date first above written.

Applied Underwriters, Inc.

By _____

Title _Executive Vice President_

Date _2/26/16_

Sedgwick Claims Management Services, Inc.

By _____

Title _VICE PRESIDENT_

Date _03/01/2016_

10

## EXHIBIT A

## SERVICE PROGRAM OVERVIEW

I.  **Introduction**

Sedgwick is administering the insured workers compensation claims for Client as follows:

| State Serviced | Sedgwick Servicing Office |
|---|---|
| NM | Albuquerque |
| HI | Honolulu |
| AK | Anchorage |
| NV | Las Vegas |
| TX, LA | Plano |
| PA | King of Prussia |
| NY | Rochester |
| NE | Omaha |
| CA | Riverside |

Insured Claims (if applicable):

A portion of Client's program is insured.  Client shall provide the relevant policy information, including a complete copy of all applicable policies, as soon as reasonably practical after same becomes available.

II.  **Account Coordination**

On behalf of Client, this service program will be coordinated by:

> Peter Gunn, Director of Claims
> Applied Underwriters Inc.
> 10805 Old Mill Road
> Omaha, NE 69154
> (402) 827-3424, ext. 4035
> Fax: (402) 827-7955

On behalf of Sedgwick, this service program will be coordinated by:

> Carmen Cox
> 2855 Coolidge Highway, Suite 216, Troy, MI, 48084248-637-4298

Each party reserves the right to change its designated representative during the term of the Agreement.

11

## EXHIBIT B

## SERVICE FEES

Client shall pay the following fees for services provided during the term of this Agreement:

1. ### Per Claim Fees

    A. Client shall pay the following fees for claims received by Sedgwick during the period beginning April 1st 2016 and ending March 31st 2017:

| Coverage line | Estimated frequency | Life of contract |
|---|---|---|
| Lost time (CA, AK, HI) | 5 | $1,595 |
| Lost time (NY) | 1 | $1,255 |
| Lost time (NV, NM, NJ, NE, TN) | 51 | $995 |
| Medical only | 226 | $155 |
| Incident only | 5 | $38 |

*Takeover claim fees*

Takeover claims are billed annually based on the number of takeover claims open at the beginning of each contract year or reopened during the year. The fees stated below are applicable as long as the number of takeover claims does not differ more than 10% from the estimates shown below.

| Coverage line | Estimated frequency | Annual takeover |
|---|---|---|
| Takeover lost time | 34 | $525 |
| Takeover medical only | 37 | $85 |

*First Year claim fee estimates*

| Coverage line | Life of contract |
|---|---|
| Workers' compensation – New claims | $95,175 |
| Workers' compensation – Takeover | $20,995 |
| Program management fee | $15,000 |
| Implementation fee Data Conversion (one-time) | Subject to IT requirements, refer to... |



| | $155/hour |
|---|---|
| Total estimated first year fees | $131,170 |

[1]Annual program management fee will be billed as the higher of the two $15,000 or 7% of annual claim fees

**Payment terms:** All implementation and data conversion fees are billed upon notification of award. Claim service, program management and information technology fees are billed on a quarterly basis in advance based on annual estimates. The estimates are subject to audit 30 days after the conclusion of each contract year. Takeover claims are billed annually based on the number of takeover claims open at the beginning of each contract year or reopened during the year. Invoices are payable upon receipt. All service fees contemplate program service commencing on 04/01/2016. In the event the effective date of services is delayed at the request of Client, Sedgwick reserves the right to bill Client for program deployment expenses incurred outside of the scope of agreed implementation period, up to and including full fees for service on the originally scheduled implementation date with invoices payable upon receipt.

B.    For purposes of this Agreement, a "Lost Time Claim" shall mean any workers' compensation Qualified Claim:

-    For which a payment is made or reserve is posted under the indemnity portion (i.e. not medical and not expense) of the Qualified Claim or the time lost from work exceeds the state prescribed waiting period; or

-    For which an application for adjudication of a claim or hearing notice is received or otherwise involves litigation or communication from or to a petitioner's attorney; or

-    Where paid medical costs exceed $2,500; or

-    denied claims that otherwise would have been classified as Lost Time Claims; or

-    claims which Client requests to be investigated or classified as a Lost Time Claim; or

-    Any claim for which subrogation is investigated or pursued; or

-    Any claim open longer than twelve months.

C.    For purposes of this Agreement, a "Medical Only Claim" shall mean any workers' compensation Qualified Claim which is not a Lost Time Claim or an Incident Only.

D.    For purposes of this Agreement, an "Incident Only" shall mean claims reported by Client that require no payment or activity other than generating a record in the data management system. These claims carry no reserves and no contacts are made by Sedgwick. If contacts are required on incident only cases, additional fees will apply.

E.  For purposes of this Agreement, a "Takeover Claim" shall mean any claim opened prior to April 1st 2016. Takeover Claims are charged the annual per claim fee shown in the pricing section for claims that are open as of the effective date of this Agreement, open at the beginning of any subsequent contract year, or are reopened during any contract year.

F.  Client acknowledges that if an Incident Only Claim is converted to Medical Only Claim, or if a Medical Only Claim is converted to a Lost Time Claim, then Client shall pay the difference in the per claim fee between the per claim fee already paid and the applicable per claim fee after the claim's conversion.

G.  Client acknowledges that the per claim fees set forth in this section 1 are based on the assumption that Client will forward to Sedgwick all claims arising under the Program within the applicable time period in a covered jurisdiction. In the event that Client does not forward to Sedgwick all such claims, Sedgwick may in its discretion adjust the per claim fees accordingly.

General assumptions in the stated fees:

* Claim intake process to remain with Client customer service center to allow for policy verification and FROI, and then sent over to Sedgwick for claims administration.

* Assumes Client will utilize a Sedgwick managed bank account.

* Program implementation/Data Conversion requirements: A one-time fee is determined based on the scope of work and service requirements.

* Single master service agreement with Client.

* Single set of best practice service handling instructions for Client's Program, business customers with customization to new claim acknowledgments, threshold for financial notification, and minor modification to specialized insured instructions such as use of attorney or designated staff preferences by each policyholder

* Single monthly invoicing to Client with no separate invoicing to each individual policyholder.

* Client will forward to Sedgwick all claims arising during the applicable time period in the stated covered jurisdictions (AK, HI, NV & NM) and employee related claims.

* Up to five viaOne view and query users for Client claim account manager and executive team. View access includes customizable dashboards, claim detail view, imaged documents access, custom alerts and a client diary. Query access includes ad hoc reporting capabilities.

* One monthly data file to Client is included at no additional cost.

Items provided for an additional fee include:

* Carrier takeover or transfer fees, if any, including test file submission fees charged by client's carrier(s) will be a direct pass-through to the client.

14

- Data conversion of historical data for handling by Sedgwick or the conversion of imaged documents.

- Additional viaOne view users ($320 per user) or viaOne query users ($1,595 per user). View access includes customizable dashboards, claim detail view, imaged documents access, custom alerts and a client diary. Query access includes ad hoc reporting capabilities.

- Additional interface files are $215 per month for monthly file, $585 per month for weekly file or $1,850 per month for daily file

- System interfaces or custom programming (IT $155/hr).

- Risk control services.

- viaOne analysis (data warehouse) and viaOne OSHA.

- Intake by any means other than utilizing Sedgwick call center or Web reporting technology (i.e., fax, email) will incur a fee of $22 per report

## 2.    Care Management Fee Schedule

All claim administration fees and services contemplate the deployment of Sedgwick's managed care services for all bill review and case management services. Managed care fees are detailed below. Fees may change from time to time upon 60 days written notice.

| MEDICAL BILL REVIEW | |
|---|---|
| State fee scheduling/usual, customary, and reasonable; state reporting of all medical bills | $7.75 per bill all medical bills |
| **PROVIDER NETWORKS** | |
| All rates are in addition to Medical Bill Review fees above | |
| Preferred provider organization (PPO) networks | 27% savings (excluding PBM Rx bills); below Fee Schedule + Med Bill Review Fee |
| California Outcomes Based Statewide Medical Provider Network (MPN) (All California Bills) | $8.00 per medical bill + Med Bill Review Fee (separate PPO fees do not apply)<br><br>(CA MPN rates do not apply to in network pharmacy) |

15

| | |
|---|---|
| Texas Healthcare Network (HCN) | $15.75 per bill + Med Bill Review Fee <br><br> (separate PPO fees do not apply) <br><br> One-time Implementation fee $2,500 |
| Out of network negotiated savings: <br><br> • Nurse review, <br><br> • quick-pay negotiations, <br><br> • usual and customary review. | 25% savings |

**CLINICAL SERVICES**

| | |
|---|---|
| Clinical consultation included in program | $70 per consultation event[1] <br><br> $95 per consultation event includes claim intake[1] <br><br> $22 misdirected calls <br><br> Implementation fee (one-time) $1,550 <br><br> For clients with anticipated call volumes of less than 25 calls per month, there is a monthly minimum fee of $1,800. <br><br> [1] $15 surcharge for nurse follow-up call |

16

| | |
|---|---|
| Telephonic case management and return to work specialists | • Evaluation & Recommendation $150 one time; If claim is subsequently referred to Telephonic Case Management, fee applied to the first month of TCM. |
| | • 1–30 days: $380 |
| | • 31–60 days: $290 |
| | • >61 days: $190* |
| | * $190 fee applies every 30 days thereafter. |
| | • Hourly Rate $92/hr |
| Utilization review | $109  per review |
| Physician advisor/peer review | $250 per review |
| Complex pharmacy management | $115 per hour, registered nurse management |
| | Physician Mgmt |
| | • 1st Medication $375 |
| | • 2-4 Meds $650 |
| | • 5-7 Meds $975 |
| | • 8-12 Meds $1,400 |
| | • >12 Meds $1,400 + $100 per each additional med (script) with cap of $2,200 |

| | |
|---|---|
| Field case management: Full field | $95 per hour, plus direct expenses<br><br>Exceptions to standard rate<br><br>• Alaska: $124 per hour<br>• California: $118 per hour<br>• Hawaii: $124 per hour<br>• New York City Boroughs: $113 per hour<br>• Catastrophic Case Management: $140 per hour<br><br>Jurisdictional fee schedules may apply |
| Field case management: Clinical assessment | $660: One visit<br><br>$795: Two visits |
| Field case management: RTW field assessment | $695 |
| Field case management: Job analysis | $640 |
| Field case management: Ergonomic evaluation | $710 |
| Field case management: Labor market survey | $580 |
| Field case management: Automated transferable skill analysis | $325 |
| Field case management: Employability field testing | $870 |
| Catastrophic oversight | $260 per claim |
| **SEDGWICK MANAGED CARE ADMINISTRATIVE SERVICES** | |
| Sedgwick Medical Card | No Charge |
| Optional CA MPN EMS | Upon Request - $2.14 per employee notice and tracking |



| | |
|---|---|
| Optional TX SWMPN Notification Service | Upon Request - $3.20 per employee notice and tracking |
| Standard Provider Panel Postings | No Charge |

3. **SIU Service Fees**

The charges set forth below are the current fees for the services listed, and these fees may change from time to time upon sixty days prior written notice to Client:

| Research services | |
|---|---|
| Comprehensive background | $450 |
| Internet investigation | $250 |
| Social media monitoring (30 days) | $100 |
| Canvassing services | $250 |
| Skip tracing/individual locate | $175 |
| Asset check | $225 |
| Criminal & civil check | $135 plus cost of records |
| | Additional counties: $35 (per county) |
| Records request | $100 plus cost of records |
| Other research services | Quote upon request |
| Field services | |

| | |
|---|---|
| Surveillance | $80 per hour: All other states<br><br>$90 per hour: California, Hawaii, and New York City (Five boroughs and Long Island)<br><br>Additional expenses to hourly rate:<br><br>• Pre-surveillance investigation: $75<br><br>• Travel: $45 per hour (includes fuel and mileage).<br><br>• License plate searches : $10 (post prelim) |
| Unmanned surveillance | $700 per day (3 day minimum)<br><br>On site analysis, deployment and extraction of stationary device:<br><br>$80 per hour: All other states<br><br>$90 per hour: California and New York City (Five boroughs and Long Island) |
| Alive and well | $250 flat rate: All other states<br><br>$275 flat rate: California, Hawaii, and New York City (Five boroughs and Long Island) |
| Activity check | $325 flat rate: All other states<br><br>$350 flat rate: California, Hawaii, and New York City (Five boroughs and Long Island)<br><br>License plate searches : $10 each |
| On-site field investigations | $85 per hour (portal to portal): All other states<br><br>$95 per hour (portal to portal): California, Hawaii, and New York City (Five boroughs and Long Island) |
| Testimony | $85 per hour (portal to portal): All other states<br><br>$95 per hour (portal to portal): California, Hawaii, and New York City (Five boroughs and Long Island) |

| | |
|---|---|
| Video processing: | $30 processing fee |
| | $30 per hour: Duplicate copies of additional video |
| | $50 per hour: Highlight video of activity |
| Fuel surcharge/credit | 2% if fuel cost is > $3.75 for 30 consecutive days |
| International investigations | Quote upon request |
| Other field services | Quote upon request |
| **Assessment services** | |
| Suspect File Review | $95/hour |
| (Includes state reporting when warranted) | |
| Fraud Investigation | $95/hour |
| (Includes state reporting when warranted) | |
| SIU program case management (client specific program) | $695 |
| Other assessment services | Quote upon request |

4. <u>California Lien Resolution Services</u>

Sedgwick will negotiate and resolve, on behalf of Client, state imposed liens on medical provider bills within the state of California. The fees for California Lien Resolution Services shall be as follows:

1. 28% of the below fee schedule savings, with a minimum charge of $125.00 per lien resolution and a cap of $7,500.

2. A negotiation that results in a written "Lien Withdrawal" or "Zero Balance Confirmation" will incur a minimum fee of $125.00 per lien withdrawal/zero confirmation letter.

3. Client agrees to pay an hourly rate of $125 per hour for Expert Witness Testimony or for Sedgwick representation, when appropriate and allowed, at the WCAB in lieu of defense counsel. The hourly rate does not include reasonable travel and mileage expenses. Mileage will be reimbursed at the

current effective standard mileage rate as issued by the Internal Revenue Service (IRS).

4.  Matters that are referred to the California Lien Resolution Unit and are later withdrawn from the unit shall incur a fee of $125 per hour for time spent by the unit working on such matters prior to removal.

### 5.    Subrogation Recoveries

Sedgwick shall pursue subrogation and Second Injury Fund recoveries as appropriate.  Client shall pay Sedgwick fifteen percent (15%) of the recovery received.  All fees and expenses, including attorneys' fees or investigations, for pursuit of any recovery shall be charged to the appropriate Qualified Claim file as an allocated loss adjustment expense.  Upon receipt of the recovery check, Sedgwick shall deposit such checks and issue payment from its Accounts Payable system to Client for the net recovery (less Sedgwick's fee).   The net recovery check will be deposited into the Client owned bank account (when one exists) or forwarded directly to Client.

### 6.    Payment Terms

Client acknowledges that all fees set forth in the Agreement are due and payable within thirty (30) days of the invoice.  Any and all past due fees will incur interest at the rate of 1.5% per month, unless otherwise prohibited by law.  Client acknowledges that in the event Sedgwick undertakes collection proceedings for any outstanding fees, then Client will reimburse Sedgwick for all costs associated with such collection action, including a reasonable attorney fee and court cost.

All fees are contingent upon claim management from the JURIS system.

## MANAGED CARE SERVICE SCHEDULE

Client has chosen the following managed care services, as defined herein:

(1) Provider Fee Management - The bill review process reviews bills against up-to-date and accurate mandated state fee schedules or the usual and customary ("UCR") data base, whichever is appropriate, to reveal excessive, duplicate, or inappropriate charges.

(2) Preferred Provider Organization ("PPO") Networks - Sedgwick will arrange for access and channeling to national and regional PPO networks including specialty networks (Diagnostics, Physical Therapy, etc. under the managed care program in conjunction with the Provider Fee Management service.

(3) Hospital Bill Review - Hospital or outpatient non-PPO bills will be reviewed by a nurse for possible errors or excessive charges relative to the patient's medical diagnosis at Sedgwick's or Client's request.

(4) Out of Network Bill Review – Bills from out of network health care providers will be reviewed, and if appropriate a negotiation with the billing provider will be pursued.  Additionally, inpatient and outpatient procedures that are not addressed by an individual state's fee schedule or UCR will be repriced to a geographically driven and cost to charge repricing database to determine appropriate reimbursement.

(5) Specialty Usual and Customary Review – Sedgwick' vendors will apply geographic charges (fee for same procedure charged by other providers in same area) and cost to charge ratios (actual cost to provider for procedure or hospital stay v. amount charged) to determine reimbursement of medical services billed that are not addressed within the jurisdictional fee schedule or usual and customary reimbursement.

(6) Field Case Management - Sedgwick will assign appropriate cases for field medical and vocational management services.

(7) Utilization Review, which includes the following components:

    (a) Prospective Review - a review prior to treatment or admission conducted by an experienced registered nurse to validate or negotiate the necessity, setting, frequency, intensity and duration of care delivery.

    (b) Concurrent Review - during the course of treatment, a review of treatment and planned procedures and establishment of target completion dates.

    (c) Retrospective Utilization Review- a review post treatment conducted by an experienced registered nurse to identify inappropriate treatment utilization.

    (d) Peer Review - physician-to-physician contact to resolve treatment and

diagnosis questions.

(8)   Prescription Services - Pharmacy program made available to Client's employees whereby a network of pharmacies, local to Employer sites/employee residences will provide prescription medications related to the work related injury with no out of pocket expenses to the employee.

(9)   Pharmacy review services include a review of all current medications prescribed to the claimant as well as a review of over the counter medication being taken by the claimant. The purpose of the review is to evaluate whether the medications prescribed to and/or taken by the claimant are appropriate for treatment of the injury or ailment which is the subject of the underlying claim being administered by Sedgwick.

(10)  Telephonic Case Management services are described below and are available upon request and for an additional fee.

(11)  Complex file review (nurse review) - Hospital or outpatient non-PPO bills that meet specific, pre-established criteria may be reviewed by a nurse for possible errors or excessive charges relative to the patient's medical diagnosis.

## Additional Managed Care Services

### Telephonic Case Management

Sedgwick will provide a telephonic medical case management program in which nurse case managers receive early notice of a worker's injury and telephonically manage the appropriate cases. Other elements of the Telephonic Case Management program include:

* The management phase includes ongoing return to work ("RTW") and treatment plan management and negotiation. The treating physician will be contacted within forty-eight (48) hours to assess/determine the treatment and RTW plan, including any negotiation required to approve the treatment plan. The Client may also be contacted to assess/determine RTW opportunities. By continuing to contact the injured worker, the provider, and the Client, case management is best able to facilitate early RTW and appropriate treatment.

* The case may go simultaneously to the assigned claim examiner and nurse or the Sedgwick claims professional will make initial contacts to determine compensability and triage based on preset triggers and/or the claims professional's judgment to determine if the case will be sent to a telephonic case management nurse.

* Throughout the telephonic case management process, telephone contact will be made with the provider, employee, and Client. Status reports will be provided, within seventy-two (72) hours, to the claims professional via documentation in the data management system as significant events (e.g., surgery, treatment plan updates, RTW status, etc.) occur in a case, and no less often than every thirty (30) days.

If, at the end of thirty (30) days, the case has not closed, the nurse case manager will contact the claims professional with a recommendation. At that time, the case will either:

24

- Close based on a decision by the claims professional
- Continue with case management on a month-to-month basis until closure and/or RTW and/or maximum medical improvement (MMI).
- Be referred for Field Case Management

Documentation of this contact will be transmitted electronically to the data management system.

- Sedgwick claims offices will receive standard, open, closed, referred, and savings reports. All information collected will allow for insured level, by office reporting. Client customized communication reports may carry an additional charge to be borne directly by Client. If this is the case, these charges will be detailed in a separate document to be agreed upon in writing between the parties.

- Also included in the telephonic case management product model are any required Prospective Utilization Review or Concurrent Utilization Review necessary to meet individual claim or statutory requirements. These product components are described below:
  - Prospective Utilization Review is a utilization review prior to treatment or admission conducted by an experienced registered nurse that can validate or negotiate the necessity, setting, frequency, intensity, and duration of care delivery.

  - Concurrent Utilization Review is the process of using experienced registered nurses to review planned procedures and treatments to optimize patient recovery in line with accepted clinical practice.

  - Prospective and Concurrent Utilization Review services may also include the use of physician advisor review such as for cases that are complicated and warrant physician review to resolve treatment or diagnosis questions.

### Evaluation and Recommendation

The Sedgwick Evaluation and Recommendation program involves triage contact with the injured worker, treating physician and, if appropriate and necessary, Client, to determine treatment and return to work ("RTW") plans and appropriateness for telephonic case management.

- In the evaluation and recommendation phase, a Sedgwick nurse will receive demographic and initial claims professional contact information and open the case. The treating physician will be contacted within forty-eight (48) hours to assess/determine the treatment and RTW plan, including any negotiation required to approve the treatment plan. The Client may also be contacted to assess/determine RTW opportunities.

- Status reports will be provided, within seventy-two (72) hours to the claims professional via documentation in the data management system as significant events (e.g., surgery, treatment plan updates, RTW status, etc.) occur in a case, and no less often than every thirty (30) days.

- Continued telephonic case management will proceed on only those cases in which clinical activities can assist in resolving medical or RTW issues at the discretion of the Sedgwick claims professional. These activities require regular contact with the injured worker, treating physician or therapist, and Client, as appropriate.

25

## CALL CENTER SERVICE SCHEDULE

1. Sedgwick will perform the following call center services:

    A.    Provide to the Client a toll free number owned by Sedgwick to be used by Client and its employees to access the Sedgwick telephonic claims intake center during the term of the Agreement between Client and Sedgwick regarding a claims administration program for Client's Program as defined in Exhibit A.

    B.    Shall fill out the appropriate form as required by an applicable program or statute.

    C.    Provide a copy of the form to Client via fax, mail, or electronically as agreed with Client.

    D.    Provide a copy of the form via fax, or electronically to the Sedgwick office responsible for managing the loss, as necessary.

2. Client agrees that:

    A.    Client shall provide Sedgwick, in a timely manner information to facilitate distribution of report copies by Sedgwick.

    B.    Client shall pay to Sedgwick a service fee which, in the initial term of this Agreement, shall be computed and payable as shown in Exhibit B, attached hereto and made a part hereof, plus applicable taxes, if any.

## SIU SERVICE SCHEDULE

Sedgwick Special Investigations Unit ("Sedgwick SIU") will provide centralized management of investigative service vendors and will maintain a national vendor list of approved service providers based upon client or local Sedgwick office preference. Sedgwick SIU will establish quality benchmarking and ensure its vendors are properly licensed and maintain insurance coverage as mandated in vendor agreements with these firms.

Sedgwick SIU will serve as a central referral and coordination unit providing the following SIU services for the fees itemized in Exhibit B:

1. Assessment services including case review, consultation, action plan development, state fraud filing, claim file demand and fraud packaging.

2. Field services including surveillance, activity checks, alive and well checks, and on-site investigations including recorded statements, AOE/COE, and scene investigations.

3. Research services including comprehensive background checks, internet searches, facility canvasses public records, skip tracing, criminal, civil and asset checks.

4. SIU compliance services including carrier and state annual reporting and fraud awareness training.

5. And, other services as outlined in Exhibit B.

## MEDICARE REPORTING SERVICES SCHEDULE

In order to assist the Client in fulfilling its Medicare beneficiary reporting obligations  under Medicare, Medicaid and State Children's Health Insurance Program Extension Act of 2007 ("MMSEA") Section 111 as set forth in 42 U.S.C. §1395y(b)(7)&(8), Sedgwick will perform the following reporting services:

1)    Sedgwick will electronically interface with the Centers for Medicare and Medicaid Services ("CMS") to capture and report data in the format prescribed by the CMS Specifications.

2)    Sedgwick will report directly to CMS on behalf of Client as an Account Designee (reporting agent), as such term is defined in the CMS User Guide as amended from time to time by CMS.

3)    Client will be considered a Responsible Reporting Entity ("RRE") as that term is defined in MMSEA Section 111 as set forth in 42 U.S.C. §1395y.  Sedgwick will assist Client as follows:

   a)    As the custodian of the original claims information from which the reports will be compiled, Sedgwick will be an authorized Account Designee for Client.  As an Account Designee, Sedgwick will prepare and submit test files to CMS in accordance with the requirements of the CMS Specifications.
   b)    Sedgwick will prepare the CMS Medicare beneficiary required data files and submit them to CMS or otherwise forward them as instructed by Client.

4)    Sedgwick will be responsible for payment of any and all fines assessed to Client in regards to compliance with the Medicare beneficiary reporting requirements of Medicare, Medicaid and SCHIP Extension Act of 2007 that relate to the negligent acts or omissions of Sedgwick except to the extent that:

   a)    Such fines or penalties are the direct result of specific direction given by Client and/or its agent or the actions or omissions of Client and/or its agent; or
   b)    Sedgwick did not receive information from Client that is essential to the performance of the duties set forth herein in a timely manner so as to be able to comply with the terms of this Agreement.

# MEDICARE WORKERS COMPENSATION COMPLIANCE SERVICES SCHEDULE

Upon request of Client and for additional fees, Sedgwick is able to perform the following Medicare Compliance Services for workers' compensation claims. The current fees for the services listed below may vary from the fees set forth at the time of contract execution, accordingly, the current fees will be provided to Client prior to such services being performed. The fees may change from time to time upon sixty days prior written notice to Client.

| No. | Service name and description | Price |
|-----|------------------------------|-------|
| 1 | Medicare Set-Aside (MSA): This comprehensive report is primarily used to assist the examiner in determining an appropriate amount of money to set aside for the benefit of Medicare at the time of settlement. | $2,050 |
| 2 | MSA without submission: This is a compact MSA report that will not be submitted to CMS for review. | $1,750 |
| 3 | Complex Medicare Set-Aside (MSA): Any MSA that includes more than 2 open claims to be included in the same report; or more than 200 pages of medical records. | $650 |
| 4 | MSA submission: Compiling, reviewing, analyzing and submitting necessary documentation to CMS for approval of an MSA. | $720 |
| 5 | Medicare Lien Resolution: Sedgwick's CMS Lien Resolution program will assist the examiner in all facets of lien resolution. | $515 |
| 6 | Medical Cost Projection (MCP): A Medical Cost Projection (MCP) is similar to an MSA in that it projects the anticipated future medical care for a claimant. | $2,250 |
| 7 | MSA/MCP Combination Report: This product is a combination of the MSA and MCP. It includes one report that summarizes medical records and two spreadsheets. | $3,300 |
| 8 | MSA Update: All updates will be charged at a flat rate. | $615 per update |
| 9 | Social Security Disability Check: We will check to determine if the claimant has applied for or been accepted for Social Security disability benefits. | $250 |
| 10 | Rated Age Request: In certain circumstances, it may be necessary to secure a rated-age in order to minimize the MSA. | $20 |

## CLINICAL CONSULTATION SERVICES SCHEDULE

Sedgwick will provide clinical consultation services. Clinical consultation services allow a nurse to speak with the injured employee at the time that the claim is reported in order to make recommendations whether medical intervention is needed. At the time of the initial call to Sedgwick, the injured employee will be transferred to a nurse who will utilize clinical guidelines to assess the injury, recommend immediate return-to-work or refer the claimant to the appropriate medical treatment provider, and document the care recommendation.

Sedgwick will make outbound calls to the injured employee on appropriate claims to obtain injured employees status and conduct the clinical consultation survey 24 hours after the initial clinical consultation call.

The current fee for agreed upon clinical consultation services are set forth in Exhibit B, but this fee will be reviewed and agreed upon annually with sixty days written notice to Client of any changes. The fee for this service shall be added to Client's periodic invoicing.

## ADDENDUM TO REVISE SERVICE AGREEMENT

This addendum ("Addendum") shall be attached to and made a part of the Service Agreement that was effective May 1, 2016 between Applied Underwriters, Inc. ("Client") and Sedgwick Claims Management Services, Inc. ("Sedgwick") (the "Agreement").

In consideration of the Agreement recitals and the mutual covenant and conditions contained herein, the Parties acknowledge that the Agreement is hereby amended as follows:

1.   Where ever the date April 1, 2016, April 1st, 2016, or 04/01/2016 appears in the Agreement, the date shall be deleted and replaced with May 1, 2016

2.   Where ever the date March 31, 2017 or March 31st, 2017 appears in the Agreement, the date shall be deleted and replaced with April 30, 2017

3.   All terms and conditions of the Agreement shall otherwise remain the same, except those terms and conditions which have been added, deleted, or modified by the parties in writing.

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be executed on the dates shown below.

Applied Underwriters, Inc.                          Sedgwick Claims Management Services, Inc.

By_____                   By_____

Title_____                    Title_____

Date_____                    Date_____



**APPLIED UNDERWRITERS, INC.**
P.O. BOX 3646 OMAHA, NE 68103-0646

*Writer's Direct Line 402-342-4900 ext. 4141; Facsimile 402-393-8558*

*E-MAIL: jeffreysilver@silver-law.net*

April 28, 2017

**Via Electronic Mail**

Kristen Corrigan
Manager Client Services
Sedgwick Claims Management Services, Inc.
1100 Ridgeway Loop Road, Suite 200
Memphis, Tennessee 38120

RE:   Applied Underwriters, Inc.

Dear Ms. Corrigan:

Applied Underwriters, Inc. ("AUI") has offices at 10805, 10815 and 10825 Old Mill Road in Omaha, Nebraska.

AUI is a diversified financial services company which provides payroll and workers' compensation insurance to its clients throughout the United States.

In that connection, we have a Service Agreement for Administration of a Claims Program dated May 1, 2016 with Sedgwick Claims Management Services, Inc., Addendum thereto (collectively the "Sedgwick Agreement").

Recently, recruiters from Sedgwick have been repeatedly contacting AUI's employees in an effort to terminate their employment with AUI and become claims adjusters of your organization. To date, Zachary Taylor, Donald Porter, Becky English, Brooke Sommerville, Crystal Swoboda and Nicole Whitehead have left AUI's employment and become claims adjusters of Sedgwick. Each of these employees had confidentiality agreements with AUI.

AUI considers such recruiting to be interfering with AUI's contractual relationship with its employees. The fact that the AUI employees are at-will employees is of no significance. Nebraska has held that tortious interference can be maintained even when the business relationship being interfered with is an at-will relationship. Just recently, Darin Judge of Sedgwick reached out to Jennifer Willison to solicit her away from AUI.



**EXHIBIT**

2

05-0206

More importantly, Sedgwick has a fiduciary relationship with AUI via the Sedgwick Agreement. Soliciting our employees is a breach of that fiduciary duty.

AUI demands that Sedgwick and its recruiters immediately cease and desist from contacting AUI's employees in order to terminate their employment relationship with AUI and become claims adjusters of Sedgwick.

In your April 27, 2017 renewal letter, you state that "[W]e value our participation with Applied Risk Services and Applied Underwriters and we look forward to the opportunity to continue to add value to their claim program over the next renewal period and beyond." Soliciting our claims adjusters is inconsistent with valuing our participation.

AUI expects Sedgwick's immediate compliance with this request.

Very truly yours,

JEFFREY A. SILVER
Secretary and General Counsel

JAS/ld

CC:   File

**Heather Murray**

| | |
|---|---|
| **From:** | Jennifer Willison |
| **Sent:** | Wednesday, April 26, 2017 1:47 PM |
| **To:** | Heather Murray |
| **Subject:** | FW: Claims Examiner, Workers Compensation in Omaha, NE |

I got this from a head hunter on LinkedIn. Thought you might be interested in sharing this info with leadership (especially the salary info. )
☺
-Jen

**From:** Jennifer Willison [mailto:jjwillison@hotmail.com]
**Sent:** Wednesday, April 26, 2017 1:33 PM
**To:** Jennifer Willison
**Subject:** FW: Claims Examiner, Workers Compensation in Omaha, NE


Sent from my Windows Phone

**From:** Darin Judge
**Sent:** 4/26/2017 1:10 PM
**To:** Jennifer Willison
**Subject:** Claims Examiner, Workers Compensation in Omaha, NE

I am reaching out to you because of your experience and background to see if you would be interested in an opportunity with Sedgwick. I am currently looking to fill a Claims Examiner, Workers Compensation in Omaha, Nebraska. We are looking for a minimum of three years' experience handling workers' compensation claims and experience with any of the following jurisdictions: Nebraska, Iowa, Minnesota, Wisconsin, and Indiana. The salary range is $50k to $65k, with a flexible schedule that is 37.5/hours a week.

Claims Examiner, Workers Compensation: The primary purpose of the position is to analyze complex or technically difficult workers' compensation claims to determine benefits due; to work with high exposure claims involving litigation and rehabilitation; to ensure ongoing adjudication of claims within service expectations, industry best practices and specific client service requirements; and to identify subrogation of claims and negotiate settlements.

If you are interested, please reach out to me directly at my email below. Please send a copy of your resume and a few times we can connect, and I look forward to speaking with you soon. If you would let me know briefly about your workers' compensation claims handling experience and what you would be looking for in compensation, I can move quickly and present you to the Hiring Manager.

Thank you.

Darin Judge
Darin.Judge@sedgwickcms.com



EXHIBIT

tabbies

3

# PROPRIETARY INFORMATION AGREEMENT

1. <u>Proprietary and Confidential Information</u> (PCI)

   For purposes of the Agreement, the term PCI means any trade secret or confidential information that Applied Underwriters, Inc. (including affiliates and subsidiaries) collectively the "Company" possesses or may possess in the future that has commercial value within the scope of business activities of the Company and/or is not generally known to the public or industry.  PCI includes but is not limited to, customer lists, financial statements, software code and formulas, technical information, including research, development, procedures, algorithms, data, designs and know-how, customer files, personnel files, marketing plans, computer records, financial and marketing data, process descriptions, research plans, formulas, payroll, financial or business strategies or affairs or any information entrusted to Company by any third party in confidence, and business strategies.

2. Employee, in consideration of his/her employment and continued employment by the Company, hereby agrees to the following:

   (a) To hold PCI in the strictest of confidence and not to divulge to others, nor to use to the detriment of the Company, nor to use in any business competitive with or similar to any business of the Company, at any time during his/her employment hereunder or thereafter so long as PCI shall retain a degree of confidentiality giving value to its protection from competitors, trade secret information obtained during the course of his/her employment hereunder without obtaining prior written permission from the President of the Company.

   (b) Promptly disclose and assign to the Company the right, title, and interest of the employee in all ideas, developments, designs, discoveries, inventions, and writings conceived and/or developed by the employee which fall within the scope of the Company's business activities.

   (c) Hold in the strictest of confidence PCI belonging to the Company except to the extent reasonably necessary to conduct the business of the Company, and shall not release and/or disclose PCI without first obtaining written permission of the President of the Company.

   (d) As a result of PCI and other personal relationships fostered between Employee and other Company employees with whom Employee may have contact, Employee after Employee's employment with Company ends, will not directly or indirectly, whether for Employee or any third party solicit or contact any current employee of the Company for any business purpose, including but not limited to employment nor shall Employee share or disseminate any listing of Company employees. It is expressly understood and agreed that Employee may maintain existing friendships, and may continue to communicate with any employee of Company so long as such communications do not in any way disparage Company or address issues concerning the business of the Company or anything related to Employee's employment with Company.



**EXHIBIT**

4

Employees who disclose PCI are subject to disciplinary action up to and including termination. Further, following termination, the undersigned Employee agrees and acknowledges that the Company may pursue injunctive or other civil penalties against employees who violate this Agreement.

This Agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on the employee's own time and (a) which does not relate (1) to the business of the Company or (2) to the Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed directly or indirectly by the Employee for the Company.

I hereby acknowledge that I have read the above Proprietary Information Agreement and understand it and agree to abide by its terms.

Employee's Signature/Date _____ 4/6/12

Social Security Number _520 - 13 -1635_

Rev. 2/12 AUI

# PROPRIETARY INFORMATION AGREEMENT

1.    Proprietary and Confidential Information (PCI)

For purposes of the Agreement, the term PCI means any trade secret or confidential information that Applied Underwriters, Inc. (including affiliates and subsidiaries) collectively the "Company" possesses or may possess in the future that has commercial value within the scope of business activities of the Company and/or is not generally known to the public or industry. PCI includes but is not limited to, customer lists, financial statements, software code and formulas, technical information, including research, development, procedures, algorithms, data, designs and know-how, customer files, personnel files, marketing plans, computer records, financial and marketing data, process descriptions, research plans, formulas, payroll, financial or business strategies or affairs or any information entrusted to Company by any third party in confidence, and business strategies.

2.    Employee, in consideration of his/her employment and continued employment by the Company, hereby agrees to the following:

(a)    To hold PCI in the strictest of confidence and not to divulge to others, nor to use to the detriment of the Company, nor to use in any business competitive with or similar to any business of the Company, at any time during his/her employment hereunder or thereafter so long as PCI shall retain a degree of confidentiality giving value to its protection from competitors, trade secret information obtained during the course of his/her employment hereunder without obtaining prior written permission from the President of the Company.

(b)    Promptly disclose and assign to the Company the right, title, and interest of the employee in all ideas, developments, designs, discoveries, inventions, and writings conceived and/or developed by the employee which fall within the scope of the Company's business activities.

(c)    Hold in the strictest of confidence PCI belonging to the Company except to the extent reasonably necessary to conduct the business of the Company, and shall not release and/or disclose PCI without first obtaining written permission of the President of the Company.

(d)    As a result of PCI and other personal relationships fostered between Employee and other Company employees with whom Employee may have contact, Employee after Employee's employment with Company ends, will not directly or indirectly, whether for Employee or any third party solicit or contact any current employee of the Company for any business purpose, including but not limited to employment nor shall Employee share or disseminate any listing of Company employees. It is expressly understood and agreed that Employee may maintain existing friendships, and may continue to communicate with any employee of Company so long as such communications do not in any way disparage Company or address issues concerning the business of the Company or anything related to Employee's employment with Company.

Rev. 2/12 AUI

Employees who disclose PCI are subject to disciplinary action up to and including termination. Further, following termination, the undersigned Employee agrees and acknowledges that the Company may pursue injunctive or other civil penalties against employees who violate this Agreement.

This Agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on the employee's own time and (a) which does not relate (1) to the business of the Company or (2) to the Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed directly or indirectly by the Employee for the Company.

I hereby acknowledge that I have read the above Proprietary Information Agreement and understand it and agree to abide by its terms.

Employee's Signature/Date _____ 9/18/12 ____

Social Security Number _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_ _____

Rev. 2/12 AUI

## PROPRIETARY INFORMATION AGREEMENT

1.  Proprietary and Confidential Information (PCI)

    For purposes of the Agreement, the term PCI means any trade secret or confidential information that Applied Underwriters, Inc. (including affiliates and subsidiaries) collectively the "Company" possesses or may possess in the future that has commercial value within the scope of business activities of the Company and/or is not generally known to the public or industry.  PCI includes but is not limited to, customer lists, financial statements, software code and formulas, technical information, including research, development, procedures, algorithms, data, designs and know-how, customer files, personnel files, marketing plans, computer records, financial and marketing data, process descriptions, research plans, formulas, payroll, financial or business strategies or affairs or any information entrusted to Company by any third party in confidence, and business strategies.

2.  Employee, in consideration of his/her employment and continued employment by the Company, hereby agrees to the following:

    (a)  To hold PCI in the strictest of confidence and not to divulge to others, nor to use to the detriment of the Company, nor to use in any business competitive with or similar to any business of the Company, at any time during his/her employment hereunder or thereafter so long as PCI shall retain a degree of confidentiality giving value to its protection from competitors, trade secret information obtained during the course of his/her employment hereunder without obtaining prior written permission from the President of the Company.

    (b)  Promptly disclose and assign to the Company the right, title, and interest of the employee in all ideas, developments, designs, discoveries, inventions, and writings conceived and/or developed by the employee which fall within the scope of the Company's business activities.

    (c)  Hold in the strictest of confidence PCI belonging to the Company except to the extent reasonably necessary to conduct the business of the Company, and shall not release and/or disclose PCI without first obtaining written permission of the President of the Company.

    (d)  As a result of PCI and other personal relationships fostered between Employee and other Company employees with whom Employee may have contact, Employee after Employee's employment with Company ends, will not directly or indirectly, whether for Employee or any third party solicit or contact any current employee of the Company for any business purpose, including but not limited to employment nor shall Employee share or disseminate any listing of Company employees. It is expressly understood and agreed that Employee may maintain existing friendships, and may continue to communicate with any employee of Company so long as such communications do not in any way disparage Company or address issues concerning the business of the Company or anything related to Employee's employment with Company.

Employees who disclose PCI are subject to disciplinary action up to and including termination. Further, following termination, the undersigned Employee agrees and acknowledges that the Company may pursue injunctive or other civil penalties against employees who violate this Agreement.

This Agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on the employee's own time and (a) which does not relate (1) to the business of the Company or (2) to the Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed directly or indirectly by the Employee for the Company.

I hereby acknowledge that I have read the above Proprietary Information Agreement and understand it and agree to abide by its terms.

Employee's Signature/Date _____ 3/27/12

Social Security Number _____ 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

Rev. 2/12 AUI

# PROPRIETARY INFORMATION AGREEMENT

1.  ## Proprietary and Confidential Information (PCI)

    For purposes of the Agreement, the term PCI means any trade secret or confidential information that Applied Underwriters, Inc. (including affiliates and subsidiaries) collectively the "Company" possesses or may possess in the future that has commercial value within the scope of business activities of the Company and/or is not generally known to the public or industry.  PCI includes but is not limited to, customer lists, financial statements, software code and formulas, technical information, including research, development, procedures, algorithms, data, designs and know-how, customer files, personnel files, marketing plans, computer records, financial and marketing data, process descriptions, research plans, formulas, payroll, financial or business strategies or affairs or any information entrusted to Company by any third party in confidence, and business strategies.

2.  Employee, in consideration of his/her employment and continued employment by the Company, hereby agrees to the following:

    (a)   To hold PCI in the strictest of confidence and not to divulge to others, nor to use to the detriment of the Company, nor to use in any business competitive with or similar to any business of the Company, at any time during his/her employment hereunder or thereafter so long as PCI shall retain a degree of confidentiality giving value to its protection from competitors, trade secret information obtained during the course of his/her employment hereunder without obtaining prior written permission from the President of the Company.

    (b)   Promptly disclose and assign to the Company the right, title, and interest of the employee in all ideas, developments, designs, discoveries, inventions, and writings conceived and/or developed by the employee which fall within the scope of the Company's business activities.

    (c)   Hold in the strictest of confidence PCI belonging to the Company except to the extent reasonably necessary to conduct the business of the Company, and shall not release and/or disclose PCI without first obtaining written permission of the President of the Company.

    (d)   As a result of PCI and other personal relationships fostered between Employee and other Company employees with whom Employee may have contact, Employee after Employee's employment with Company ends, will not directly or indirectly, whether for Employee or any third party solicit or contact any current employee of the Company for any business purpose, including but not limited to employment nor shall Employee share or disseminate any listing of Company employees. It is expressly understood and agreed that Employee may maintain existing friendships, and may continue to communicate with any employee of Company so long as such communications do not in any way disparage Company or address issues concerning the business of the Company or anything related to Employee's employment with Company.

Employees who disclose PCI are subject to disciplinary action up to and including termination. Further, following termination, the undersigned Employee agrees and acknowledges that the Company may pursue injunctive or other civil penalties against employees who violate this Agreement.

This Agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on the employee's own time and (a) which does not relate (1) to the business of the Company or (2) to the Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed directly or indirectly by the Employee for the Company.

I hereby acknowledge that I have read the above Proprietary Information Agreement and understand it and agree to abide by its terms.

Employee's Signature/Date _____ 7/8/13

Social Security Number _____ 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 _____

# PROPRIETARY INFORMATION AGREEMENT

1.  Proprietary and Confidential Information (PCI)

    For purposes of the Agreement, the term PCI means any trade secret or confidential information that Applied Underwriters, Inc. (including affiliates and subsidiaries) collectively the "Company" possesses or may possess in the future that has commercial value within the scope of business activities of the Company and/or is not generally known to the public or industry. PCI includes but is not limited to, customer lists, financial statements, software code and formulas, technical information, including research, development, procedures, algorithms, data, designs and know-how, customer files, personnel files, marketing plans, computer records, financial and marketing data, process descriptions, research plans, formulas, payroll, financial or business strategies or affairs or any information entrusted to Company by any third party in confidence, and business strategies.

2.  Employee, in consideration of his/her employment and continued employment by the Company, hereby agrees to the following:

    (a)  To hold PCI in the strictest of confidence and not to divulge to others, nor to use to the detriment of the Company, nor to use in any business competitive with or similar to any business of the Company, at any time during his/her employment hereunder or thereafter so long as PCI shall retain a degree of confidentiality giving value to its protection from competitors, trade secret information obtained during the course of his/her employment hereunder without obtaining prior written permission from the President of the Company.

    (b)  Promptly disclose and assign to the Company the right, title, and interest of the employee in all ideas, developments, designs, discoveries, inventions, and writings conceived and/or developed by the employee which fall within the scope of the Company's business activities.

    (c)  Hold in the strictest of confidence PCI belonging to the Company except to the extent reasonably necessary to conduct the business of the Company, and shall not release and/or disclose PCI without first obtaining written permission of the President of the Company.

    (d)  As a result of PCI and other personal relationships fostered between Employee and other Company employees with whom Employee may have contact, Employee after Employee's employment with Company ends, will not directly or indirectly, whether for Employee or any third party solicit or contact any current employee of the Company for any business purpose, including but not limited to employment nor shall Employee share or disseminate any listing of Company employees. It is expressly understood and agreed that Employee may maintain existing friendships, and may continue to communicate with any employee of Company so long as such communications do not in any way disparage Company or address issues concerning the business of the Company or anything related to Employee's employment with Company.

Rev. 2/12 AUI

Employees who disclose PCI are subject to disciplinary action up to and including termination. Further, following termination, the undersigned Employee agrees and acknowledges that the Company may pursue injunctive or other civil penalties against employees who violate this Agreement.

This Agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on the employee's own time and (a) which does not relate (1) to the business of the Company or (2) to the Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed directly or indirectly by the Employee for the Company.

I hereby acknowledge that I have read the above Proprietary Information Agreement and understand it and agree to abide by its terms.

Employee's Signature/Date _Nannun Casey   3/27/12_

Social Security Number _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_

Rev. 2/12 AUI

# PROPRIETARY INFORMATION AGREEMENT

1. <u>Proprietary and Confidential Information</u> (PCI)

   For purposes of the Agreement, the term PCI means any trade secret or confidential information that Applied Underwriters, Inc. (including affiliates and subsidiaries) collectively the "Company" possesses or may possess in the future that has commercial value within the scope of business activities of the Company and/or is not generally known to the public or industry. PCI includes but is not limited to, customer lists, financial statements, software code and formulas, technical information, including research, development, procedures, algorithms, data, designs and know-how, customer files, personnel files, marketing plans, computer records, financial and marketing data, process descriptions, research plans, formulas, payroll, financial or business strategies or affairs or any information entrusted to Company by any third party in confidence, and business strategies.

2. Employee, in consideration of his/her employment and continued employment by the Company, hereby agrees to the following:

   (a) To hold PCI in the strictest of confidence and not to divulge to others, nor to use to the detriment of the Company, nor to use in any business competitive with or similar to any business of the Company, at any time during his/her employment hereunder or thereafter so long as PCI shall retain a degree of confidentiality giving value to its protection from competitors, trade secret information obtained during the course of his/her employment hereunder without obtaining prior written permission from the President of the Company.

   (b) Promptly disclose and assign to the Company the right, title, and interest of the employee in all ideas, developments, designs, discoveries, inventions, and writings conceived and/or developed by the employee which fall within the scope of the Company's business activities.

   (c) Hold in the strictest of confidence PCI belonging to the Company except to the extent reasonably necessary to conduct the business of the Company, and shall not release and/or disclose PCI without first obtaining written permission of the President of the Company.

   (d) As a result of PCI and other personal relationships fostered between Employee and other Company employees with whom Employee may have contact, Employee after Employee's employment with Company ends, will not directly or indirectly, whether for Employee or any third party solicit or contact any current employee of the Company for any business purpose, including but not limited to employment nor shall Employee share or disseminate any listing of Company employees. It is expressly understood and agreed that Employee may maintain existing friendships, and may continue to communicate with any employee of Company so long as such communications do not in any way disparage Company or address issues concerning the business of the Company or anything related to Employee's employment with Company.

Rev. 2/12 AUI

Employees who disclose PCI are subject to disciplinary action up to and including termination. Further, following termination, the undersigned Employee agrees and acknowledges that the Company may pursue injunctive or other civil penalties against employees who violate this Agreement.

This Agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on the employee's own time and (a) which does not relate (1) to the business of the Company or (2) to the Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed directly or indirectly by the Employee for the Company.

I hereby acknowledge that I have read the above Proprietary Information Agreement and understand it and agree to abide by its terms.

Employee's Signature/Date _____ / 5-20-2013

Social Security Number _____ 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

Rev. 2/12 AUI

# PROPRIETARY INFORMATION AGREEMENT

1.  Proprietary and Confidential Information (PCI)

    For purposes of the Agreement, the term PCI means any trade secret or confidential information that Applied Underwriters, Inc. (including affiliates and subsidiaries) collectively the "Company" possesses or may possess in the future that has commercial value within the scope of business activities of the Company and/or is not generally known to the public or industry. PCI includes but is not limited to, customer lists, financial statements, software code and formulas, technical information, including research, development, procedures, algorithms, data, designs and know-how, customer files, personnel files, marketing plans, computer records, financial and marketing data, process descriptions, research plans, formulas, payroll, financial or business strategies or affairs or any information entrusted to Company by any third party in confidence, and business strategies.

2.  Employee, in consideration of his/her employment and continued employment by the Company, hereby agrees to the following:

    (a)  To hold PCI in the strictest of confidence and not to divulge to others, nor to use to the detriment of the Company, nor to use in any business competitive with or similar to any business of the Company, at any time during his/her employment hereunder or thereafter so long as PCI shall retain a degree of confidentiality giving value to its protection from competitors, trade secret information obtained during the course of his/her employment hereunder without obtaining prior written permission from the President of the Company.

    (b)  Promptly disclose and assign to the Company the right, title, and interest of the employee in all ideas, developments, designs, discoveries, inventions, and writings conceived and/or developed by the employee which fall within the scope of the Company's business activities.

    (c)  Hold in the strictest of confidence PCI belonging to the Company except to the extent reasonably necessary to conduct the business of the Company, and shall not release and/or disclose PCI without first obtaining written permission of the President of the Company.

    (d)  As a result of PCI and other personal relationships fostered between Employee and other Company employees with whom Employee may have contact, Employee after Employee's employment with Company ends, will not directly or indirectly, whether for Employee or any third party solicit or contact any current employee of the Company for any business purpose, including but not limited to employment nor shall Employee share or disseminate any listing of Company employees. It is expressly understood and agreed that Employee may maintain existing friendships, and may continue to communicate with any employee of Company so long as such communications do not in any way disparage Company or address issues concerning the business of the Company or anything related to Employee's employment with Company.

Rev. 2/12 AUI

Employees who disclose PCI are subject to disciplinary action up to and including termination. Further, following termination, the undersigned Employee agrees and acknowledges that the Company may pursue injunctive or other civil penalties against employees who violate this Agreement.

This Agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on the employee's own time and (a) which does not relate (1) to the business of the Company or (2) to the Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed directly or indirectly by the Employee for the Company.

I hereby acknowledge that I have read the above Proprietary Information Agreement and understand it and agree to abide by its terms.

Employee's Signature/Date _____   7/14/14

Social Security Number ___ 5C7-23-1120 _____

Rev. 2/12 AUI



### sedgwick.

1100 Ridgeway Loop Road, Suite 200
Memphis, Tennessee 38120

Melisa A. Spencer
Senior Vice President
Managing Counsel - Litigation
Direct Dial (901) 415- 7717
Facsimile (901) 415-7409
Email:  Melisa.Spencer@sedgwickcmsi.com.

May 12, 2017

Mr. Jerry Silver
Applied Underwriters, Inc.
P.O. Box 3646                    **Via Electronic Mail and Regular U.S. Mail**
Omaha, NE 68103                  jeffreysilver@silver-law.net

RE:    Applied Underwriters Cease and Desist Letter of April 28, 2017

Dear Mr. Silver:

Kristen Corrigan forwarded your letter of April 28, 2017, and your subsequent email dated May 9, 2017, wherein you threaten litigation for alleged tortious interference with Applied Underwriter Inc.'s claim department.

Sedgwick has undertaken a thorough review of the allegations and determined that it has not engaged in the tortious interference with Applied Underwriters Inc.'s business nor have its colleagues violated any prior employment terms with Applied Underwriters, Inc.

Sedgwick employs both in-house colleagues and third party vendors to manage its recruiting and hiring practices. Sedgwick has instructed all of its recruiters that they are not to contact any candidate at his or her place of business. They are directed to use only industry standard practices and tools to attract candidates for open positions at Sedgwick. Sedgwick posts its open positions on its website and in other public recruiting forums. If our colleagues are approached by prospective employees, they are instructed to direct the candidate to our website so that the candidate can apply through our on-line system.

Sedgwick requires all of its colleagues to honor all employment agreements with former employers including especially, but not limited to, all confidentiality, non-solicit and non-compete terms. In response to your letter and email, Sedgwick took advanced steps to remind the former Applied Underwriters, Inc. employees identified in your letter of those obligations. Sedgwick has also taken steps to ensure its recruiters do not unilaterally contact Applied Underwriters, Inc.'s current employees.



**EXHIBIT**

5



I welcome the opportunity to discuss Sedgwick's policies and practices in more detail, if needed. Please direct all future correspondence on this matter to my attention.

Regards,

Melisa A. Spencer

cc:     Kristen Corrigan

Filed in Douglas District Court
*** EFILED ***
Case Number: D01CI170007821
Transaction ID: 0005768502
Filing Date: 09/13/2017 12:51:45 PM CDT

## IN THE DISTRICT COURT OF DOUGLAS COUNTY, NEBRASKA

| | |
|---|---|
| APPLIED UNDERWRITERS, INC., a ) Nebraska Corporation, ) | CASE NO. _____ |
| ) | |
| Plaintiff. ) | |
| ) | **PRAECIPE** |
| vs. ) | |
| ) | |
| SEDGWICK CLAIMS MANAGEMENT ) SERVICES, INC., a Delaware ) Corporation, ) | |
| Defendant. ) | |

TO THE CLERK OF SAID COURT:

Please issue Summons to serve Defendant **Sedgwick Claims Management Services, Inc.** with copy of the Complaint by Certified Mail as follows: **Sedgwick Claims Management Services, Inc.,** 1100 Ridgeway Loop Road, Suite 200, Memphis, Tennessee 38120, in the above-entitled case.

DESIGNATE MODE OF SERVICE:

SHERIFF: ☐

CERTIFIED MAIL. ☒

/s/ Jeffrey A. Silver
JEFFREY A. SILVER    #13839
10805 Old Mill Road
Omaha, Nebraska 68154
(402) 393-1984
ATTORNEY FOR PLAINTIFF

Image ID:
D00478301D01



SUMMONS

Doc. No.    478301

IN THE DISTRICT COURT OF Douglas COUNTY, NEBRASKA
1701 Farnam
Omaha          NE 68183

Applied Underwriters, Inc. v. Sedgwick Claims Management

Case ID: CI 17      7821

TO:  Sedgwick Claims Management

**FILED BY**
Clerk of the Douglas District Court
09/13/2017

You have been sued by the following plaintiff(s):

Applied Underwriters, Inc.

Plaintiff's Attorney:    Jeffrey A Silver
Address:                 10805 Old Mill Rd.
                         Omaha, NE 68154-2607

Telephone:               (402) 393-1984

A copy of the complaint/petition is attached. To defend this lawsuit, an
appropriate response must be served on the parties and filed with the office of
the clerk of the court within 30 days of service of the complaint/petition. If
you fail to respond, the court may enter judgment for the relief demanded in the
complaint/petition.

Date:  SEPTEMBER 13, 2017    BY THE COURT:    _John M. Friend_
                                                    Clerk

PLAINTIFF'S DIRECTIONS FOR SERVICE OF SUMMONS AND A COPY OF THE
COMPLAINT/PETITION ON:

        Sedgwick Claims Management
        1100 Ridgeway Loop Road
        Suite 200
        Memphis, TN 38120

Method of service:  Certified Mail

You are directed to make such service within ten days after the date of issue,
and file with the court clerk proof of service within ten days after the signed
receipt is received or is available electronically, whichever occurs first.

**SERVICE RETURN**

Doc. No.    478301

Douglas District Court
1701 Farnam
Omaha                    NE 68183

To:
Case ID: CI 17    7821 Applied Underwrite v. Sedgwick Claims Ma

Received this Summons on _____,_____. I hereby certify that on

_____, _____ at _____ o'clock ___M. I served copies of the Summons
upon the party:

_____

by _____

_____

_____

as required by Nebraska state law.

Service and return      $ _____

Copy                          _____

Mileage ____miles         _____

   TOTAL            $ _____

Date: _____   BY: _____
                                           (Sheriff or authorized person)

## CERTIFIED MAIL
## PROOF OF SERVICE

Copies of the Summons were mailed by certified mail,
TO THE PARTY: _____

At the following address: _____

_____

_____

on the _____ day of _____ _____, as required by Nebraska state law.

_____

Postage $ _____   Attorney for: _____

The return receipt for mailing to the party was signed on _____,_____.

To: Sedgwick Claims Management          From: Jeffrey A Silver
    1100 Ridgeway Loop Road                10805 Old Mill Rd.
    Suite 200                              Omaha, NE 68154-2607
    Memphis, TN 38120

# ATTACH RETURN RECEIPT & RETURN TO COURT

Filed in Douglas District Court
*** EFILED ***
Case Number: D01CI170007821
Transaction ID: 0005819922
Filing Date: 09/20/2017 04:53:07 PM CDT

Image ID:
D00478301D01

## SUMMONS

IN THE DISTRICT COURT OF Douglas COUNTY, NEBRASKA
1701 Farnam
Omaha            NE 68183

Applied Underwriters, Inc. v. Sedgwick Claims Management

Case ID: CI 17    7821

TO:  Sedgwick Claims Management

You have been sued by the following plaintiff(s):

Applied Underwriters, Inc.

Plaintiff's Attorney:    Jeffrey A Silver
Address:                 10805 Old Mill Rd.
                         Omaha, NE 68154-2607

Telephone:               (402) 393-1984

A copy of the complaint/petition is attached. To defend this lawsuit, an
appropriate response must be served on the parties and filed with the office of
the clerk of the court within 30 days of service of the complaint/petition. If
you fail to respond, the court may enter judgment for the relief demanded in the
complaint/petition.

Date:  SEPTEMBER 13, 2017    BY THE COURT:    John M. Friend
                                              Clerk

PLAINTIFF'S DIRECTIONS FOR SERVICE OF SUMMONS AND A COPY OF THE
COMPLAINT/PETITION ON:

        Sedgwick Claims Management
        1100 Ridgeway Loop Road
        Suite 200
        Memphis, TN 38120

Method of service:  Certified Mail

You are directed to make such service within ten days after the date of issue,
and file with the court clerk proof of service within ten days after the signed
receipt is received or is available electronically, whichever occurs first.

**SERVICE RETURN**

Doc. No.   478301

Douglas District Court
1701 Farnam
Omaha          NE 68183

To:
Case ID: CI 17   7821 Applied Underwrite v. Sedgwick Claims Ma

Received this Summons on _____,_____. I hereby certify that on

_____, _____ at _____ o'clock ___M. I served copies of the Summons
upon the party·

by _____

_____

_____

as required by Nebraska state law.

Service and return       $ _____

Copy                     _____

Mileage ____miles        _____

   TOTAL               $ _____

Date: _____   BY: _____
                                   (Sheriff or authorized person)

**CERTIFIED MAIL**
**PROOF OF SERVICE**

Copies of the Summons were mailed by certified mail,
TO THE PARTY:  Sedgwick Claims Management Services, Inc.

At the following address: 1100 Ridgeway Loop Rd., #200, Memphis, TN 38120

_____

on the ___13___ day of ____September_____ 2017_, as required by Nebraska state law.

Postage $ 9.18   Attorney for:  Plaintiff

The return receipt for mailing to the party was signed on   09/19   , 2017 .

To: Sedgwick Claims Management          From: Jeffrey A Silver
    1100 Ridgeway Loop Road                   10805 Old Mill Rd.
    Suite 200                                 Omaha, NE 68154-2607
    Memphis, TN 38120

**ATTACH RETURN RECEIPT & RETURN TO COURT**

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Sedgwick Claims Mgmt Serv.
1100 Ridgeway Loop Rd.
Suite 200
Memphis, TN 38120

9590 9402 2407 6249 5864 67

2. Article Number (Transfer from service label)

7016 2140 0000 3195 3048

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☑ Agent
☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☑ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053        Domestic Return Receipt

## Certificate of Service

I hereby certify that on Tuesday, September 26, 2017 I provided a true and correct copy of the Return-Summons/Alias Summons to the following:

Sedgwick Claims Management service method: No Service

Signature: /s/ Silver,Jeffrey,A (Bar Number: 13839)